Johnson *v.* County of Stark.

OLOF JOHNSON, Plaintiff in Error, *v.* THE COUNTY OF STARK, Defendant in Error.

ERROR TO PEORIA.

The General Assembly has the constitutional right to authorize counties and cities to become shareholders in railroad companies.

The granting of such authority does not conflict with the eighth section of article thirteen of the constitution, which declares, that no freeman shall be disseized of his freehold, etc. Nor does it conflict with the fifth section of the ninth article.

One or more bonds may be issued and exchanged by the county, and if their issuance is subsequently recognized by the action of the county, it will be held to be a ratification.

Counties, like individuals, will be held to their liabilities, and will not be permitted to avoid them because of unimportant irregularities in the action of their officers.

The fact that a *coupon* is made payable in New York, or elsewhere than at the treasury of the county issuing it, will not invalidate it; the objectionable words will be regarded as surplusage.

The holder of an unindorsed coupon is entitled to demand payment upon it.

A coupon is proper evidence under the common money counts.

THIS was an action of debt commenced by plaintiff against defendant, in Stark county, and moved, by change of venue, to Peoria county.

The declaration contained two counts: 1st, a special count, declaring on fifty bonds and coupons issued by defendant, to the Western Air Line Railroad Company; and, 2nd, the common money counts.

Plea of nil debet to 2nd count.

Pleas to 1st count, and to the bond described in the 1st count, as follows:

1st plea. Nil debet.

2nd plea. Non est factum.

3rd plea. That the bonds were obtained by the payees by fraud and covin, and were assigned to plaintiff with notice.

4th plea. That the bonds were obtained by the railroad company acting in concert with plaintiff.

5th plea. That the board of supervisors of Stark county, had no power or authority to issue the bonds.

6th plea. That Webster and Fuller, mentioned in the bonds, had no authority to issue the bonds.

7th plea. No such corporation as the payee mentioned in the bonds.

8th plea. That Fuller had no right or authority to attach the seal of the county to the bonds.

9th plea. That Schenck and Fenn had no authority to assign or indorse said bonds.

10th plea. Non est factum.

11th plea. That the property in the bonds is in the payees.

12th plea. That under the order made by the board of supervisors, one bond for $50,000 was issued and indorsed to plaintiff, and that no further order was passed for the issuing of the fifty bonds, mentioned in declaration.

13th plea. That the vote for the subscription was Aug. 13th, 1853, and that there was but ten per cent. assessment on the stockholders in said railroad company.

Plaintiff entered a *nolle pros.* of all causes of action, excepting such as arise upon bond No. 9, and coupon No. 3, which was attached to said bond.

On the trial of the cause, plaintiff introduced in evidence:

A certified copy of the records of the County Court of Stark county, showing that an election was ordered to be held in the several townships in said county, on the 13th day of August, 1853, at the usual places of holding elections or town meetings in said towns, for the purpose of voting for or against the subscription, by the said county of Stark, to the capital stock of the said Western Air Line Railroad Company, of the amount of fifty thousand dollars. Bonds to be issued for said sum, (in case a majority of the legal voters, as required by law, shall vote for said subscription,) running twenty years, and bearing six per cent. interest per annum, by the proper authorities, under the laws of this State; the bonds to be issued on condition that said road shall run through the central part of said county, as near as practicable.

Certified copy of record of the board of supervisors of Stark county, held September 12th, 1853, on which day was presented to said board of supervisors an abstract from the poll books of

an election held in the several townships in said county, on the 13th day of August, 1853, pursuant to above notice, for or against the subscription, by the said county, of $50,000 to the capital stock of said railroad company, under the order aforesaid, which abstract was ordered to be spread upon the records of said board, in which the votes were as follows:

For the subscription, 534 votes; against the subscription, 141 votes.

A certified copy of the records of the said board of supervisors of Stark county, at a special meeting held July 31st, 1855, where the following order was passed:

" Ordered, that the chairman of the board of supervisors be, and he is hereby authorized, to subscribe fifty thousand dollars to the capital stock of the Western Air Line Railroad, and that the clerk be authorized to issue to said company fifty thousand dollars of Stark county bonds, payable in twenty years from the date hereof, bearing interest at the rate of six per cent. per annum, payable annually, at such place as said company may designate, which said bonds may be in such sums as may be designated by said company, not less than one thousand dollars each, and shall have interest coupons attached, which said bonds and coupons shall be signed by the chairman of this board, and attested by the clerk, with the seal of the county attached thereto."

To the introduction of which evidence the defendant objected.

A certificate of the county clerk of Stark county, showing the whole number of votes cast at the general election, Nov., A. D. 1852, and at the election for subscription to the said railroad, held August 13th, 1853, as follows:

Whole number of votes cast at the general election, Nov. 2, 1852, in said county of Stark, 771 votes; that at the election held on August 13th, 1853, there were cast in favor of said subscription, 534 votes, and 141 votes were cast against said subscription, and that said 534 votes was a majority of the qualified votes of said county of Stark; taking as a standard the number of votes thrown at the last general election, held on the 2nd day of November, A. D. 1852, as hereinbefore stated, being the last general election held in said county, previous to the 13th day of August, A. D. 1853.

To the introduction of which, in evidence, the defendant objected.

The plaintiff then introduced a witness who, being examined upon his *voir dire*, testified that he had no interest in this suit; that he was a stockholder, and one of the directors of the Western Air Line Railroad Company; that he had paid up his stock subscribed to the said company, except some conditional

stock not yet required to be paid, and that the bond of Stark county in suit, was transferred, and he accepted the same upon his own responsibility, and that it was indorsed merely because the bond was payable to order and not to bearer.

Defendant then objected to the said witness on account of his interest, which objection was overruled by the court, and said witness permitted to testify.

Said witness then testified as follows: I was present when the bond and coupon now shown me were executed. William W. Webster was chairman of the board of supervisors of Stark county, and Miles A. Fuller, clerk. The signatures of said Webster and Fuller, to the said bond and coupon, are genuine; the bond and coupon are in the words and figures as follows, to wit:

No. 9.　　UNITED STATES OF AMERICA.　　$1,000.

STATE OF ILLINOIS, COUNTY OF STARK. { ISSUED BY THE BOARD OF SUPER- VISORS OF THE COUNTY OF STARK.

KNOW ALL MEN BY THESE PRESENTS, That there is due from the County of Stark, in the State of Illinois, to the Western Air Line Railroad Company, or order, one thousand dollars lawful money of the United States, with interest at the rate of six per cent. per annum, payable annually at the city of New York, on the presentation and surrender of the annexed coupon. The principal is payable at Toulon, in the County of Stark, State of Illinois, twenty years after the date hereof. For the performance of all which, the faith of the county is irrevocably pledged, as also the property, revenue, and resources of said county.

*In Witness Whereof,* William W. Webster, Chairman of the Board of Supervisors, and Miles A. Fuller, Clerk of said County of Stark, [L. S.]　have this, the thirty-first (31st) day of July, eighteen hundred and fifty-five, hereunto set their hands, and said Clerk has affixed the seal of said county, at his office in Toulon, in said county.

W. W. WEBSTER, Chairman of the Board of Supervisors.
MILES A. FULLER, Clerk.

Indorsed: "Pay to O. Johnson, or bearer. Robt. C. Schenck, Pres. Western Air Line Railroad Co. Ira I. Fenn, Treasurer Western Air Line Railroad Co."

BOND No. 9.　　　　　($60).　　　　　COUPON No. 3.

The County of Stark, State of Illinois, will pay sixty dollars on this coupon, on the 31st day of July, 1858, at the city of New York.

W. W. WEBSTER, Chairman.
MILES A. FULLER, Clerk.

Which coupon was then offered in evidence by the witness, to the introduction of which, the defendant objected.

This coupon was detached from the bond. This bond was delivered to me as the agent of the company, together with other bonds, fifty in all, in payment of the subscription of Stark

county to the Western Air Line Railroad Company; Robt. C. Schenck was president, and Ira I. Fenn, treasurer, of said railroad company. I was present at the time the bond was sealed and delivered. I do not recollect the date it was executed. I was acting for the railroad company; we had a conditional contract with Olof Johnson or with the Bishop Hill Colony, for grading sixteen miles of the railroad, from Wyoming to Galva, which had to be closed by the 5th of August, 1855, and under that contract we were to furnish the bonds of Stark county. The company designated that the bonds should be issued in sums of one thousand dollars each. The county had no blank bonds, and it was agreed between the chairman and clerk of the board of supervisors and myself and Judge Ramsey, who was also acting for the company, that the said chairman and clerk should issue one bond for fifty thousand dollars, which bond I was to hold until I could procure the fifty blank bonds from Chicago, or from some other place, and they were then to execute fifty bonds of one thousand dollars each, to bear the same date as the one bond for fifty thousand dollars, which was July 31st, 1855, and when the fifty bonds were filled up and executed, I was to return the one bond for fifty thousand dollars and deliver it up to the said chairman and clerk, and they were to deliver to me for the company, fifty bonds for one thousand dollars each. I was to hold the bond merely to enable the railroad company to close the contract with Mr. Johnson or with the Bishop Hill Colony. The bond for $50,000 was not the bond the railroad company designated; the company designated fifty bonds of $1,000 each; the one bond for $50,000 was to be held by me until I could procure the blanks. It was perhaps a month or six weeks I held the bond; I called upon Mr. Webster, the chairman, and Mr. Fuller, the clerk, and informed them that I had the blanks for the fifty bonds of 1,000 each, ready for them to sign, which they did. After they had signed the fifty bonds of $1,000 each, and put the seal on them, they then delivered them to me, and I delivered over to Mr. Webster, the original bond for $50,000; I also delivered to him certificates of stock for $50,000 in the Western Air Line Railroad Company, and the fifty bonds which I received from the said chairman and clerk I delivered to the railroad company, and the railroad company transferred them to plaintiff in this suit, the one bond in suit being one of them in payment in part for a contract the company had made with him or the Bishop Hill Colony for grading sixteen miles of the said railroad.

Plaintiff also offered in evidence a certified copy of the record of the board of supervisors of Stark county, at a special meeting, Feb. 25, 1856, as follows:

" Whereas the county of Stark, having subscribed $50,000 to the capital stock of the Western ᐧ Air Line Railroad, and issued its bonds therefor with interest coupons attached, which said coupons are payable in the city of New York : Therefore it is ordered by the board, that W. W. Webster and Lewis H. Fitch, be and they are hereby authorized to confer and make arrangements with Mr. Olof Johnson, for the payment of the first installment of said interest, coming due on the 31st of July next, subject to the approval of the Board."

Also record of meeting held March 10, 1856, on which day the committee, appointed as above, made their report to said board, in substance as follows : " That they had conferred with Mr. Johnson, and that he had proposed to receive the amount of interest coming due July 31st, being three thousand dollars, adding exchange on New York thereto, and deducting interest from date to the maturity of said coupons, making $2,967.50, and that he would enter into bond to pay said interest in the city of New York, and to release the said county of Stark from all further trouble or expense in making said payment, and that he would return the interest coupons thus paid, to the board of supervisors, to be cancelled, on or before the 31st of July, 1856." On which report it was ordered, that said report be accepted ; and it was further ordered that the proposal of said Johnson be accepted.

Olof Johnson presents his bond to said board, which is approved, and it is conditioned to take up said interest coupons coming due 31st of July, 1856 ; and it is further ordered by said board, that the treasurer pay to O. Johnson, $2,967.50 for the payment of the interest on Stark county railroad bonds as per contract, this day entered into.

At a special meeting of said board of supervisors, held June 3rd, 1856, there was an order reciting the contract aforesaid with Johnson, and that said Johnson had returned the interest coupons specified in the contract and in his bond, to be cancelled ; it was ordered that the said bond be delivered up to said Johnson, he having complied with the conditions thereof.

At a special meeting of said board of supervisors, held June 14, 1857, Olof Johnson proposed to said board, that upon the payment to him of $2,662.50 he would enter into bond to return the interest coupons on railroad bonds coming due July 31st, 1857 ; which proposal was accepted and the bond filed. To the introduction of which evidence the defendant objected ; which objection was overruled by the court, and the said copy of record permitted to be read in evidence by the plaintiff.

Plaintiff introduced a witness, who on his *voir dire* said that he was a stockholder in the Western Air Line Railroad Com-

pany, and that his stock was paid up. Defendant then objected to said witness, on account of his interest, which objection was overruled by the court, and the defendant excepted to such decision ; and witness testified as follows: I was an officer of the Western Air Line Railroad Company, July 31st, 1855. The said company was duly organized at that time, and acting as such under their charter, and according to the tenor of their charter. The necessary amount of stock had been subscribed, to enable the said railroad company to organize under their charter. The records of the said railroad company were then shown to witness and identified, and proven by him, and the plaintiff offered to read the same in evidence, for the purpose of showing that the said railroad company was, on the 31st of July, 1855, duly organized, and acting as such, but the defendant dispensed with the reading of the same.

Plaintiff offered in evidence, certified copies of records of the board of supervisors of Stark county, as follows:

Order passed at a special meeting of said board, Feb. 25th, 1856, as follows: " Ordered, that W. W. Webster, chairman, be and he is hereby authorized to cast the number of votes that the county of Stark may be entitled to, for directors of the Western Air Line Railroad, on the 5th day of March, A. D. 1856."

Order passed by said board of supervisors, March 3rd, 1857 : " Ordered, that Isaac Thomas be and he is hereby authorized to cast the votes which the county of Stark may be entitled to cast, for directors of the Western Air Line Railroad, at an election to be held at Lacon, March 4th, 1857."

It was also proved, that at an election of the stockholders of the Western Air Line Railroad Company, held in Lacon, in March, 1856, for the election of directors of said company, William W. Webster, chairman of the board of supervisors of Stark county, was present, and cast the vote of Stark county, as a stockholder, in said election ; and that at an election of the stockholders of said railroad company, for directors of said company, held in March, 1857, Isaac Thomas was present, and cast the vote of said Stark county, at said election, as a stockholder in said company.

A witness was introduced by plaintiff, who testified that the board of supervisors refused to pay the said interest coupons ; the coupon offered in evidence, is one of those presented to the board of supervisors for payment.

The reason the county officers refused to pay the interest, was because the work on the railroad had been suspended.

The bond and coupon were excluded from the jury ; to which ruling of the court the plaintiff excepted ; and thereupon, no

6

further evidence being offered, the jury returned a verdict for defendant.

Plaintiff then moved the court to award a new trial in said cause, for the reasons following:

1st. The verdict of the jury is against the weight of evidence given in said cause.

2nd. The said verdict is against law.

3rd. The court mistook the law.

4th. The court erred in excluding the bond and coupon, offered in evidence to the jury.

5th. The court excluded proper evidence from the jury, which was offered by plaintiff; but the court overruled the motion for a new trial.

These objections were made by defendant during the trial below:

To the statute: That it is unconstitutional.

To the order for the election: That it does not conform to the statute.

To the record of the election: That the notice required by the act is not shown.

To the order for the subscription and bonds: That it was not made till a general election had been held, after the vote on the question of subscription. That it was made by the supervisors alone; it should have been made by the County Court, if at all. That it was made at a special meeting, and it does not appear that previous notice was given. That it does not contain the condition of location required by the order for the election.

To the bond: That it is a special contract under seal, and admissible under the common counts. That the interest is payable out of the county. That the supervisors had no power to issue, or cause the issue of such obligations. That Webster and Fuller had no authority to execute and deliver them, and thereby bind the county. That it is not properly indorsed. That the issue of the first bond for $50,000, exhausted the power conferred by the order of the supervisors. That the bond was obtained by the covin and fraud of the plaintiff and the railroad company. That the consideration has failed, by an abandonment of the railroad by the company. That a subscription by the county has not been shown.

To the coupon, beside those assigned to the bond: That no payee is named. That it is not indorsed or assigned. That it is not sealed. That it is not negotiable, neither by law-merchant nor by the statute. That the coupon is not an obligation, but is intended for a mere receipt for interest. That the doctrine of merger prevents their existence as an obligatory instrument. That they are payable out of the county.

To proving by parol the alleged agreement with Webster and Fuller, to issue the first bond as security, and for its return, and the issuing of fifty bonds in lieu thereof: That no such authority is given them by the order of the board of supervisors. That no discretionary power was, or could have been, given to them. That all acts, orders, and proceedings, by which a county can be bound, are required to be recorded, and cannot be proved otherwise than by the record. That an agreement with Webster and Fuller, or either of them, neither did nor could bind the county. That proof of the fact of a prior issue of a bond, and thereby a previous exhaustion of the power, is of a different nature from proof of such an agreement. That even if a surrender of the first bond could be shown, the plaintiff could take nothing thereby; it would not impart any validity to the subsequent issue. And that the pretended authority of the chairman and clerk, is against public policy and the law of the land.

To the evidence of the payment of interest: That a municipal corporation cannot be estopped to deny the acts and authority of its pretended officers and agents.

The assignment of errors was as follows:

The court erred in excluding from the jury, the bond offered in evidence by the plaintiff; in excluding from the jury, the coupons offered in evidence by the plaintiff; in overruling the motion for a new trial, made by the plaintiff; and in rendering judgment against the plaintiff below for costs.

The great importance of the questions of law determined, and the large pecuniary interests settled by this case, induce the reporter to publish with the case the statutes under which the case originated:

"An Act supplemental to an act entitled 'An act to provide for a general system of railroad incorporations.'

"Sec. I. *Be it enacted, etc.*, That whenever the citizens of any city or county in this State are desirous that said city or county should subscribe for stock in any railroad company already organized or incorporated, or hereafter to be organized or incorporated under any law of this State, such city or county may and are hereby authorized to purchase or subscribe for shares of the capital stock in any such company, in any sum not exceeding one hundred thousand dollars for each of such cities or counties; and the stock so subscribed for or purchased shall be under the control of the *County Court* of the county, or common council of the city, making such subscription or purchase, in all respects as stock owned by individuals.

"Sec. II. That for the payment of said stock, *the judges of the County Court* of the county, or the common council of the city, making such subscription or purchase, are hereby authorized to

borrow money at a rate not exceeding ten per cent. per annum, and to pledge the faith of the county or city for the annual payment of the interest, and the ultimate redemption of the principal; or if the said judges or common council should deem it most advisable, they are hereby authorized to pay for such subscription or purchase, in bonds of the city or county, making such subscription to be drawn for that purchase, in sums not less than fifty dollars, bearing interest not exceeding ten per centum per annum : *Provided,* That no bond shall be paid out at a rate less than par value.

" SEC. III. The railroad companies already organized or incorporated, or hereafter to be organized or incorporated under the laws of this State, are hereby authorized to receive the bonds of any county or city becoming subscribers to the capital stock of such company, at par, and in lieu of cash, and to issue their bonds, bearing interest not exceeding ten per centum per annum, for any moneys by them borrowed for the construction of their railroad and fixtures, or for the purchase of engines and cars, and for such purpose may dispose of any bonds by them received as aforesaid.

" SEC. IV. No subscription shall be made, or purchase or bond issued, by any county or city under the provisions of this act, whereby any debt shall be created by said judges of the County Court of any county, or by the common council of any city, to pay any such subscription, unless a *majority of the qualified voters* of such county or city (taking as a standard the number of votes thrown at *the last general election previous to the vote* had upon the question of subscription under this act for the county officers,) shall vote for the same ; and the judges of the County Court of any county, or the common council of any city, desiring to take stock as aforesaid, shall give *at least thirty days' notice* in the same manner as notices are given for election of State or county officers in said counties, requiring said electors of said counties or said cities to vote upon the day named in such notices, at their usual place of voting, for or against the subscription for said capital stock which they may propose to make, and *said notices shall specify* the *company* in which stock is proposed to be subscribed, the *amount* which it is proposed to take, and the *time* which the bonds proposed to be issued are to run, and the *interest* which said bonds are to bear ; or in case it is proposed to borrow money to pay such subscription, then the notice shall state the *terms* upon which such loan is to be effected ; and the opinion of the electors shall be expressed upon their ballots ' for subscription ' or ' against subscription,' and counted and returned by the judges and clerks of elections as in other cases ; and if a majority of the voters

of said county or city, assuming the standard aforesaid, shall be in favor of the same, such authorized subscription or purchase, or any part thereof, shall then be made by said judges or common council. In case any election had under this act, is held upon a day of general election, then the number of votes thrown at such general election for county officers shall be the standard of the number of qualified voters as aforesaid. No bonds shall be issued under the provisions of this act by any county or city, excepting for the amounts required to be paid at the time of subscription, and for the amounts of and at the time when *assessments* upon all the stockholders of said company shall be regularly assessed and made payable.

" SEC. V. This act shall take effect from and after its passage."

The above act was approved in 1849. On the first day of March, 1854, an amendment thereto was approved, to wit:

" AN ACT to facilitate the construction of railroads.

" SEC. I. *Be it enacted, etc.*, That any city or county in this State, which, under the provisions of an act entitled 'An act supplemental to an act entitled "An act to provide for a general system of railroad incorporations," ' approved November 5, 1849, has heretofore subscribed, or may hereafter subscribe, for stock in any railroad company, payable in the bonds of said city or county, it shall be lawful for the city council of such city, or the judges of such county, and they are hereby authorized and empowered to issue and deliver to such railroad company the whole or any portion of the bonds of such city or county, payable on such subscription, at any time hereafter, when, in their opinion the interest of such city or county will be promoted thereby, whether the assessments upon the stockholders of said company have been regularly assessed and made payable or not."

MANNING & MERRIMAN, for Plaintiff in Error.

A. W. ARRINGTON, and C. C. BONNEY, for Defendant in Error.

WALKER, J. It is urged, in affirmance of the judgment below, that the General Assembly had no constitutional warrant for the enactment of 1849, authorizing counties and cities to become shareholders in railroad companies. If this position be true, it then follows that plaintiff has no right to recover on this coupon, and the judgment of the court below must be affirmed. We shall therefore proceed to the consideration of this question. Our attention is called first to the 38th section of article three, of our constitution, as prohibiting the exercise of

this legislative power. In the case of *Prettyman* v. *Tazewell County*, 19 Ill. R. 406, this provision of that instrument was considered, and held by this court not to militate against this enactment, and that the law was not in conflict with it. We have not as yet perceived any reason to change the conclusion then announced.

It is again urged, that this act is in violation of the 8th section of article 13, which is this: "That no freeman shall be imprisoned, or disseized of his freehold or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." This great principle of *Magna Charta* was incorporated into our bill of rights, to better secure the citizen against the exercise of arbitrary power by any of the departments of government. It was feared that in the limitation of the powers of government, in the other part of the constitution, the rights of the citizen might not have been secured, by express provision, against the exercise of power so unjust and oppressive as this section expressly prohibits. The security afforded by this section is deemed essential to the well being of society, and embraces principles that lay at the very foundation of all constitutional government. This act does not profess to disseize the citizen directly of his property, but by incurring this debt, its payment by taxation follows as a consequence. The question then arises, whether the tax thus imposed and collected, would deprive the citizen of his property contrary to the law of the land. It, when levied, would necessarily be imposed on all the property within the limits of the county belonging to individuals, and would be of a uniform rate upon its valuation. That mode alone being recognized by the constitution in the imposition of such taxes. Were an effort made to deprive the citizen of his property or freehold by a tax imposed alone on him, to which the property of other individuals in the same local division was not made subject, it would no doubt violate this section of the constitution, but this act professes no such object, nor can it by any means be held to have such an operation. We are not aware that this provision of the bill of rights, which it is believed has been incorporated into the constitution of each of the several States of the Union, has ever been held to limit or in any way restrict the general taxing power exercised under and in conformity to the constitutional limitations on that subject.

It is also supposed that the enactment under consideration is repugnant to the 11th section of the same article of that instrument. This article provides that the property of the citizen shall not be taken or applied to public use, without the consent

of his representatives in the General Assembly, nor without just compensation being made to him. This eminently just and important provision was designed to secure the citizen in representation, as a condition to the imposition of the burthens of government, and also to secure him a full compensation, in value, for his property, when it might, by enactment of the General Assembly in which he was represented, be taken and appropriated to public use. This provision has made the right to appropriate private property to public use, to depend upon a right to be represented in the General Assembly which should enact the law making such appropriation. Hence this provision has required that it shall not be taken or applied without the consent of his representatives, or without compensation. It was intended to secure, and does secure, the citizen against the appropriation of his property to public use, except it be under and in accordance with legislative enactment. If done in any other mode, it would be without constitutional warrant. But it is believed that this provision has no reference to the taxing power enjoyed by the government. That power depends upon, and is governed by other principles, and is regulated by other provisions of that instrument. This provision was designed to regulate the exercise of the right of eminent domain by the government, and to regulate the mode in which the exigencies of government might be relieved, when it should become necessary to appropriate any species of property owned by an individual, for that purpose. But it in no wise relates to, or affects the general taxing power of the government, and therefore does not prohibit the adoption of this enactment of the legislature.

We come now to the consideration of the fifth section of the ninth article, upon which the weight of the argument in this case, against the constitutionality of this act, was based. It is this : "The corporate authorities of counties, townships, school districts, cities, towns and villages, may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property, within the jurisdiction of the body imposing the same. And the General Assembly shall require that all the property within the limits of municipal corporations, belonging to individuals, shall be taxed for the payment of debts contracted under authority of law." As before observed, it is urged that the act under consideration is supposed to be unconstitutional, by defendants in error, because a tax on the property of individuals in the county, to meet this indebtedness, follows its creation as a necessary consequence. This constitutional provision is too clear and explicit, in conferring upon the General Assembly power to authorize the county to levy and collect such a tax, for corporate purposes,

to admit of any question. It then becomes necessary to ascertain, whether the aiding in the construction of a railroad running through its limits, is such a county purpose as authorizes the legislature to confer upon it that power.

That the public at large, the individual shareholders of the company, and the citizens of the county, all have an interest in the construction of such a road, is too plain to admit of any doubt. By its completion, the public have increased facilities for travel and transportation, the shareholders the prospect of profit on their investment, and the citizens of the county have afforded to them increased facilities for trade and commerce, enhanced value to property within their local division, with the more speedy development of their agricultural and other resources. The citizens of the county, while they enjoy advantages common to the public at large, have other and more important benefits resulting from its construction. In the completion of these improvements, the whole community is either immediately or remotely interested, those near the line on which it passes, in a larger, and those more remotely situated, in a less degree. But all participate in its benefits.

In the affairs of life, public and private interests are so closely blended, that it is difficult to draw the line separating, in all cases, the one from the other. Numerous cases may be given, fully illustrating each, but the establishment of any rule by which each may be distinguished from the other, is, perhaps, impracticable. All will perceive that the building of court-houses, jails, poor-houses, the opening and keeping in repair of common highways, and the erection and maintenance of bridges, by which they are rendered useful to the people, are " county purposes," for which the people of the county may be taxed. And that the erection of hotels, mercantile, manufacturing, trading and banking houses, although of great importance to the prosperity of the community, are not such purposes as were contemplated by the framers of the constitution. These are properly regarded as matters of individual enterprise, and cannot, in any reasonable or just sense, be regarded as public or county purposes.

Then, is the construction of a railroad, through a county, within the meaning of this section of the constitution, such a county purpose? Common highways, turnpike roads, toll bridges, and improvements of that character, and for which local taxes may be imposed, have been so held by judicial determination, and so regarded in numerous cases where the power has never been questioned. Then, if a common highway, a turnpike road, or a toll bridge, be a county purpose, which authorizes municipal corporations to become shareholders, to aid in their construc-

tion, no reason is perceived why a railroad is not such a county purpose. It has for its object the same purposes that are attained by the others. But this is not a question of first impression in the courts of this country. It has been presented and judicially determined in numerous cases, in all of which it is believed to have been held to be a corporate purpose, authorizing the levy of a local tax, for the payment of the subscription. *Nichol* v. *Mayor and Aldermen of Nashville*, 9 Humph. 252; *Louisville and Nashville Railroad Company* v. *The County Court, Davidson et al.*, 1 Snede R. 637; *Goddin* v. *Crump et al.*, 8 Leigh, 120; *Talbot* v. *Dent*, 9 B. Mon. 526; *Thomas* v. *Leland*, 24 Wend. 65; *Slack* v. *Maysville and Lexington Railroad Company*, 13 B. Mon. 1; *Commonwealth* v. *Mc Williams*, 1 Jones, (Penn.) 61; *The People* v. *Mayor of Brooklyn*, 4 Comstock, 419.

This doctrine is fully recognized in the case of *Shaw* v. *Dennis*, (5 Gilm. 405,) by this court. And these authorities of our sister States proceed further, and hold, that to render such an improvement a corporate purpose, it need not be confined to or penetrate the limits of the county or city making the subscription. The question, whether such improvements are county purposes, is not presented for decision by this record, and we therefore refrain from the expression of any opinion.

It is also urged, that when the agents of the county executed one bond for the entire subscription, that they had thereby exhausted their authority to bind the county, and that their subsequent acts were unauthorized and void. The evidence shows that when that bond was issued, it was only done for the reason, that there was not on hand the necessary blanks to issue them in any other mode. It was at that time agreed between the parties, as soon as blanks could be procured, that the bond previously issued should be returned, and others issued in sums of one thousand dollars each, which was afterwards done, and the bond to which this coupon was annexed is one of those thus issued. In the view we take of this question, it can matter but little whether or not the authority at first conferred by the county upon these agents, authorized them to take up that bond and issue others for the amount, as the county, by repeated subsequent acts, has fully ratified and confirmed these latter bonds.

That bond was returned and delivered to the agents of the county, and it has never been tendered back or returned to the railroad company to whom it was issued, nor to the plaintiff in this suit. By holding it, they acknowledge the legality of the issue of these bonds. Again, they have, at two elections, cast the vote for directors of this road, which the stock received for these bonds entitled the county to give. They also, by

order of their board of supervisors, have paid two annual installments of interest falling due upon these bonds, and took up and destroyed the coupons therefor. When the president of the board of supervisors was one of those agents of the county, to issue the bonds, it is impossible to believe that the board of supervisors were not fully apprized of the mode in which they were issued, and intentionally regarded them as legally issued and binding, when they performed these several acts. These acts, unexplained, are as satisfactory evidence of a design to ratify the issue of these bonds, as if it had been done by an order of the board of supervisors.

It is also alleged, that informalities have occurred, in giving the notice and in conducting the election, to determine whether the county would, or not, authorize a subscription to this road, and for that reason, the bonds and this *coupon* are void. In the case of *Prettyman* v. *Tazewell County*, 19 Ill. R. 406, it was held, that if such irregularities had occurred, it was necessary, for the purpose of preventing the officers from proceeding, to make the subscription, and to issue the bonds, that steps must be promptly taken by an appropriate remedy to contest the election, and restrain them from proceeding. And that we would not inquire, after any considerable delay, whether fraudulent means had been resorted to for the purpose of procuring a favorable result to the election for subscription. It would be manifestly against every principle of justice to permit the tax-payers and citizens of a county, through their officers, to procure money, labor or materials, upon bonds of the county, issued on an affirmative vote of the citizens at an election held in a case authorized by the law, to escape all liability because of some slight informality in conducting the election, which was, or at least might have been, readily known to every citizen of the county before the bonds were issued. Counties have no right to procure all the benefits of an act which they are authorized to perform, recognized and acted upon by them as legal, and then escape liability, any more than have private individuals. They must respond to their legal engagements to the same extent as individuals.

Nor does it make any difference that the enterprise in which they have engaged has proved to be ill advised, if it was within the scope of their authority. In this case, the whole matter was submitted to the determination of the citizens, to be affected by it. They were left perfectly free to choose for themselves whether they would lend the aid of the county to the enterprise. They have not even the right to complain that they had no choice in the imposition of the burthen. By issuing these bonds to the company, the county became one of the largest owners

of, or shareholders in the road, and, in common with the other shareholders, undertook its control and management, by directors and officers of their own choice. And there can be no pretense of right to impose the loss growing out of the want of success in the enterprise, upon a *bona fide* holder of the identical bonds given by the county to become a part owner of this road. He can, by no process of reasoning, be held liable for the acts of the county, or their agents, in which he had no participation. If the directors of the road, in whose election the county had its voice, have, in executing their trust, exceeded their authority, or acted in a reckless disregard of the interest of the stockholders, or wasted or misapplied the means of the company, the county, as a shareholder, or any citizen of the county, being a tax payer, had the right to restrain them from thus proceeding. They have failed to take any such steps, so far as this record shows, and they, like the other stockholders, must be bound by the acts of their directors.

It was held by this court, in the case of *The People ex rel.* v. *Tazewell County*, 22 Ill. R. 147, that counties and municipal corporations, unless specially authorized by legislative enactment, have no power to make their indebtedness payable at any other place than at their treasury. That proceeding was an application for a writ of *mandamus*, to compel the board of supervisors to issue bonds and coupons, payable in the city of New York. The application was based upon a demand of such bonds and coupons; and as there had been no demand of such securities payable at the county treasury, the question now under consideration was not then before the court, and was not determined. The board of supervisors could not be in default until they had refused to issue bonds and coupons, authorized by law, upon a proper demand. No such demand was made in that case, and therefore the court could not compel them to proceed to issue such securities. This case presents the question, whether instruments, evidencing their indebtedness payable specifically at any other place, are void, or whether they may be upheld as payable at their treasury. This coupon on its face purports to be payable at the city of New York. The doctrine is well recognized, that in exercising a power, all acts performed in excess of, or beyond the power delegated, must be rejected as unwarranted; and if, after their rejection, there has been enough done to show a proper execution of the power, the act will be sustained, irrespective of the acts beyond the power delegated. But, on the contrary, if the acts performed beyond the authority conferred, are so inseparably connected with the acts properly performed, that by their rejection, the power remains unexecuted, then the whole transaction must be rejected as void. When

tested by this rule, it will be perceived that this *coupon* may be sustained as valid, and payable at the treasury of the county. The law authorized the county to issue it, and requires no place of payment to be named. And where none is specified, it, by operation of law, is payable at the treasury. If this coupon had not contained the language, " at the city of New York," it would have been a legal instrument, strictly conforming to all the requirements of the law authorizing counties. to issue evidences of indebtedness. If, then, this unauthorized portion of the coupon were rejected, it would be in conformity to the law, and for the purpose of upholding it, the law will reject that portion, as surplusage. This doctrine was announced by the very able district judge of United States District Court for Wisconsin, in the case of *Mygatt* v. *The City of Greenbay*, which was precisely similar to this case.

It is also urged, that the plaintiff has no legal title to this instrument, which will authorize a recovery. The bond to which it was annexed was duly assigned to plaintiff; but there is no indorsement on the *coupon*. It seems to be the well-settled doctrine, that state, county, city and other bonds, and public securities of this character, are negotiable by delivery only, without indorsement, in the same manner as bank bills, especially when they are payable to bearer. Redfield on Railways, 595, and authorities cited. It is true, that this coupon names no person as payee, nor is it specifically payable to bearer. But the promise is, " to pay sixty dollars on this *coupon*." The promise is to pay the sum named on the instrument, and it can only be demanded by the person holding it, and precisely as if it was payable in terms to bearer. There is no room to doubt that the specified amount, by the terms of the agreement, is payable to, and may be demanded by the holder after its maturity. Its legal effect is, that the money is to be paid on the coupon, and to the holder presenting it for that purpose. It then follows, that the holder may sue for, and recover the money in his own name.

The only remaining question presented by this record is, whether this coupon was admissible in evidence under the common money counts. We are not aware of any well considered case which has held, that a note not under seal, payable to bearer, is inadmissible under these counts. Nor is there any rule of pleading, or of evidence, which rejects such an instrument. If it, when issued, was delivered to plaintiff, it affords evidence that he has lent money to the maker, for which it was given, or if he purchased it of any other person, that he paid money for the use of the maker, on his debt, for which, the law implies a promise to pay him the amount specified in the instrument when

it falls due. In either event, this *coupon* was admissible under the appropriate money count, and should have been admitted. The court below therefore erred in rejecting it as evidence, and the judgment must be reversed and the cause remanded.

*Judgment reversed.*