(No. 26549.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.* THE CITY OF PARIS, Appellee.

*Opinion filed September 21, 1942.*

504

WARD E. DILLAVOU, State's Attorney, (VAN SELLAR & VAN SELLAR, ROBERT F. COTTON, and HAROLD E. NIMZ, of counsel,) for appellant.

HARTMAN SCHWARTZ, and VAIL, MILLS & ARMSTRONG, for appellee.

Mr. JUSTICE MURPHY delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Edgar county, entered in a *quo warranto* action instituted in the name of the People by the State's Attorney of that county, against the city of Paris. Issues were joined and after a hearing of evidence, the defendant was adjudged not guilty and the information was dismissed. The trial judge certified that the validity of two ordinances was involved and that the public interest required that their validity be passed upon by this court.

The parties differ in their views as to the questions that are the subject of inquiry in a *quo warranto* proceeding of this character. That this may be fully considered in discussing the contentions of the parties, it is necessary to outline the substance of the pleadings, for the questions presented are questions of law which arise on the pleadings.

The information charged the defendant with having unlawfully exercised and claimed the power to exercise without warrant or authority the right to issue and dispose of $820,000 of public utility certificates in acquiring, constructing and operating a municipal electric light and power public utility. The prayer was that the defendant make answer by what warrant or authority it exercised such power.

The defendant's answer was in justification and referred to the Municipal Ownership Act (Ill. Rev. Stat. 1941, chap. 111⅔, pars. 96-110) wherein power is granted cities and villages to acquire, own and operate public utilities upon compliance with the provisions of the act. Conditions upon which a city may own and operate a public

utility may be stated in a general way: that there shall be the enactment of an ordinance setting forth the action proposed, a description of the plant, equipment and property proposed to be acquired or constructed, and the issuance of bonds, mortgage certificates or special assessment bonds to pay for the same. The statute also requires a favorable referendum on the approval of the ordinance and on the right to own and operate the utility proposed.

It was alleged in defendant's answer that on August 26, 1940, the city council passed an ordinance, referred to as ordinance No. 6, which provided for the construction, ownership and operation of an electric light and power public utility, the equipment necessary to be acquired and the issuance of public utility certificates for the payment of the same, which certificates were to be paid out of the revenue derived from the operation of the utility. It was alleged that the ordinance in its final form remained with the clerk the requisite period for public inspection, that it was signed and approved by the mayor and had been duly published. It is further stated that thereafter ordinance No. 7 was passed, duly approved and published. The latter ordinance called a special election for October 15, 1940, for the purpose of voting upon the approval of ordinance No. 6. The propositions submitted were, briefly: (1) Shall ordinance No. 6 be approved; (2) Shall the public utility certificates be issued to the amount of $820,000; (3) Shall the city operate an electric light and power utility as provided in ordinance No. 6. The ordinance divided the city into four precincts, fixed the boundaries and designated the location of voting places in each precinct. It prescribed the form of ballots, named the election judges and clerks and gave the city clerk directions as to his duties in the posting and publishing of notices for the election. The result of the election was pleaded, showing that 3298 votes were cast on proposition No. 1, of which 2028 were for and 1270 against; 3245 votes were cast on proposition

No. 2, 1962 for and 1283 against; and that on proposition No. 3, 3382 votes were cast, of which 2053 were for and 1329 against. Defendant contends that by virtue of the matters and things set forth in reference to said ordinances, the election and result thereof and the proof made, it had the right to exercise the power and authority to acquire, own and operate an electric public utility under the provisions of the Municipal Ownership Act, to issue the certificates in question and use the proceeds therefrom in the acquisition of the plant.

Plaintiff's reply contained many general denials as to the passage of the ordinances, their approval and the election, but plaintiff's contentions relate more specifically to that part of the reply pleaded as affirmative matter. Plaintiff admitted the defendant was operating under a commission form of government and that the project proposed by defendant was a public utility within the provisions of the Municipal Ownership Act. No attack is made upon the validity of the act and no question is raised as to the extent of the power granted when all steps required by statute have been taken.

As a basis for the contention that the powers granted by the Municipal Ownership Act were not available to the defendant by reason of non-compliance with all the requirements, it was alleged as affirmative matter that in November, 1939, the city council met in secret session at a place other than the regular meeting place and adopted a resolution accepting a proposition previously made by Lansford & Company, whereby the company would name the engineers the city was to employ and make a preliminary survey and prepare plans and specifications for the proposed improvement. The proposal as accepted also included the sale of the utility certificates to Lansford & Company. It was alleged the proposition submitted by Lansford & Company and the resolution of the council accepting it constituted a void contract and that as such it became the

basis for the passage of ordinances No. 6 and No. 7, and that they would not have been passed had it not been for such illegal contract. It was also stated that pursuant to the contract the defendant had procured contracts to furnish electric service with more than 50% of the consumers of electricity residing in the city. It was claimed that this influenced the special election held October 15. Other alleged defects were that ordinance No. 6 did not state a definite interest rate that the public utility certificates were to bear, did not fix the location of a plant, that the plans and specifications were not complete and did not contain an estimate of the income that would be derived from the operation of the plant or that it would be sufficient to meet the utility certificates, that the certificates were not payable at the office of the city treasurer, that they could be called for payment prior to the stated maturities, that the deed of trust proposed in the ordinance was not set out therein, and that one section of the ordinance pledged the income to the payment of the certificates, while other sections provided for the deduction of operating expenses before applying any of it to the payment of certificates.

Ordinance No. 7 was alleged to be void for the reasons that No. 6 was void, that there were irregularities in the election, that propositions on the ballots were not properly stated, the boundaries of the voting precincts were not properly fixed and many persons who were legal voters were deprived of their vote, while others who had no right to vote were given such privilege. Improper location of the voting booths was pleaded together with other irregularities which it was claimed were of such gross character as to make the election void. On motion of defendant, parts of plaintiff's reply were stricken and that ruling is one of the errors assigned. It will be considered later.

The scope of inquiry is limited to a test of defendant's power and authority to issue $820,000 of utility certificates and use the proceeds therefrom in constructing and operat-

ing an electric light and power public utility. It is conceded the Municipal Onwership Act is the source from which the city must acquire the power to own and operate such a public utility. Therefore, the sole question is as to whether the defendant has met the conditions prescribed by the act so that the power it would acquire under the act by compliance is now available to it. Failure to adopt valid ordinances and to have a valid election would prevent defendants from exercising the power. In this connection the distinction must be made between the acts of the defendant which were taken in meeting the conditional requirements of the statute and those taken by the city officials in the exercise of the power. Those belonging to the latter class are not open to inquiry in a *quo warranto* action. (*People ex rel. Nelson* v. *Taylor,* 281 Ill. 355; *People ex rel. Shamel* v. *Baldridge,* 267 id. 190.) The question is not as to how the city officials exercised the power but as to whether the city had the right to exercise the power provided by statute.

The trial court counted the ballots and plaintiff interposed objections to some of them but it is now conceded that if all such ballots were rejected there would remain a majority in favor of each proposition. In recognition of this condition of the record, plaintiff has limited its contentions on this appeal to the following: that the election was invalid for the reasons (1) that in submitting ordinance No. 6 to a referendum it was for the approval by the electorate when it should have been submitted for their adoption, (2) that the submission of the proposition as to whether the city should issue utility certificates was not required or authorized by statute, (3) that the ballots submitting the three propositions were not in accord with the requirements of the Australian Ballot Act, (4) that there was no registration of voters, (5) that the election was conducted in such a way as to render it void; and that the ordinance was void for the reason (6) the public utility certificates were payable in Chicago instead of at the office

of the treasurer of the defendant city, and (7) that the attempted sale of the certificates to Lansford & Company under a void contract had such an influence upon the passage of the ordinance and the election that all of the proceedings should be declared void.

The pertinent parts of proposition No. 1, by which ordinance No. 6 was submitted to a referendum appeared on the ballot as follows: "Shall Ordinance No. 6 * * * entitled * * * passed by the Council of the City of Paris and signed by the Mayor of said City on the 26th day of August, 1940, be approved?" This form was as provided in ordinance No. 7.

Plaintiff contends there is a material difference between submitting an ordinance for "approval" and submitting it for "adoption." It is urged that if an ordinance passed by the city council and signed by the mayor was submitted to the voters for approval, they would understand they were merely "rubber stamping" or giving sanction to that which had been done by the officers of the city, while in submitting the proposition of the adoption of an ordinance the voters would conclude that the passage and approval of the ordinance by the council and mayor had not made it effective and that their approval was necessary to complete the adoption of it. The objection is highly technical and the contentions advanced in support of it overlook the plain provisions of the statute. Section 3 (par. 98) of the Municipal Ownership Act prescribes that no city shall proceed to acquire or construct any public utility until an ordinance providing therefor has been duly passed, submitted to refendum "and approved by a majority of those voting thereon." Proposition No. 1 submitted the ordinance to the voters in accordance with the mandate of that section. It expressly provides that the ordinance shall not become effective until it has been approved by a majority of those voting thereon. Reference is made to other sections of the act where referendum is required on other

questions and the language used in those sections is that it shall be submitted for adoption. It is argued that the use of the word "adoption" in these sections is significant and indicates an intent on the part of the legislature of requiring a majority vote on the adoption of the ordinance. Without passing on the form in which questions under other sections of the act should be submitted, for they refer to matters not involved here, it is sufficient answer to plaintiff's argument to say that, inasmuch as the section which directs the referendum provides it shall be submitted for approval, such provision should control.

The third proposition submitted on a separate ballot was: "Shall the City of Paris operate a Municipal Electric Light and Power Public Utility as provided for in Ordinance No. 6 * * * passed by the Council of the City of Paris and signed by the Mayor of said City on August 26, 1940?" It was submitted on a form which required the voting of yes or no. It was to meet the requirements of section 4 (par. 99) which prescribes that no city shall proceed to operate a public utility unless the proposition to operate shall first have been submitted to the electors of the city as a separate proposition and approved by a majority of those voting thereon. The approval of the voters required under section 4 differs from the proposition to be submitted under section 3 in that one refers to the approval of an ordinance while the other is to obtain an expression from the voters as to whether the city shall operate the public utility described in the ordinance. A voter might be in favor of the city owning and operating the utility described in the ordinance and vote affirmatively on the proposition when submitted under section 4, but opposed to other provisions of the ordinance and vote against its approval when submitted under section 3. The first assignment is without merit.

Plaintiff contends there was no authorization in the statute for submitting the second proposition, that is, as

to whether public utility certificates should be issued and sold for the purpose of acquiring money to pay for the public utility. In reply to this defendant refers to the *proviso* to section 9 (par. 104) and contends it demands a referendum on such proposition. The proviso prescribes that no public utility certificates shall ever be issued unless and until the question of adoption of the ordinance authorizing the issue shall first have been submitted to the electors and approved by a majority voting upon such question. It is obvious the legislature did not intend that the proviso would require a separate referendum upon the issuance of public utility certificates. If it had so intended it would have made provision for such requirement by express statement the same as is required on the question of the ownership and operation of a public utility under section 4. The requirement for a referendum under the proviso of section 9 is complied with when there has been an approval under section 3 of an ordinance which contains provision for the issuance of public utility certificates.

Defendant contends as an alternative that even though the statute did not authorize submission of proposition No. 2 to a referendum, there was nothing in submitting it that warrants declaring the election void. Ordinance No. 6 contained provisions in reference to the issuance of utility certificates, setting forth the purpose, date, maturity, interest rate and form to be used. This was required by section 3 of the act, and proposition No. 2 merely submitted the question of the issuance on the same terms and conditions as provided in the ordinance. Several matters were included in ordinance No. 6 and a voter passed upon all of them when he voted on the approval or rejection of the ordinance under proposition No. 1. The question submitted on the issuance of the utility certificates, proposition No. 2, was a part of the whole as contained in the ordinance, and when the voter cast his ballot on that proposition, he had nothing to consider which was not already

provided for in the ordinance and submitted under proposition No. 1. The second assignment is overruled.

As a third point plaintiff contends the election was void for the reason that the three propositions submitted at the election did not meet the requirements of section 16 of the Australian Ballot Act. (Ill. Rev. Stat. 1941, chap. 46, par. 305.) Propositions No. 1 and No. 2 were submitted on the same ballot, while proposition No. 3 was separate. It was a special election and there was no ballot submitted with the names of candidates for any office. A question is raised as to whether the provisions of the Ballot act controlled in this election. In view of the construction we give section 16 of the Ballot act, it will not be necessary to determine whether that act controlled the holding of this election for the reason that the provision invoked by plaintiff has no application in this case. The direction in section 16 that the public measure shall be indicated on a separate ballot is construed to mean that it shall be on a ballot separate from the one on which the names of candidates for public office appear and that it does not mean that there shall be a separate ballot for each public measure voted upon. That the legislature so intended is indicated by the amendments of section 16 enacted since 1929. Prior to 1929 the law provided that whenever a constitutional amendment or other public measure was proposed to be voted upon, the amendment and the public measure should be clearly indicated on a separate ballot. (Ill. Rev. Stat. 1927, chap. 46, par. 305.) In *People ex rel. Vance* v. *Elledge,* 281 Ill. 592, the question before the court was whether three public measures submitted at a town election should each be on a ballot separate from the others. The provisions of the Ballot act including those in section 16 were considered. It was said: "It is clear from the wording of this section that the legislature did not intend a separate or special ballot for each proposition to be submitted to the voters. This is the reasonable and natural

construction of this section, and it has been assumed, so far as we know, by this court and all public officials that had to do with the question, that all propositions should be printed upon a ballot separate from the ballot on which the candidates' names were ·printed . but all propositions upon the same ballot."

When the section was amended in 1929 (Laws of 1929, page 393) constitutional amendments and public measures were dealt with separately, the former being covered by a new section, 15½. As to constitutional amendments the law was changed so that a proposition for such an amendment was required to be printed on the ballot where the names of the candidates for State office appeared. The provisions in regard to public measures remained the same as prior to 1929 until section 16 was amended in 1931. (Laws of 1931, page 567.) This amendment divided the public-measure questions and required that all those that were submitted to be voted upon by the people of the State should be printed upon the same ballot with the names of the candidates for State offices. It provided that all measures submitted in any district or political subdivision less than the State should be on a separate ballot. It will be noted that in all the amendments the requirement as to public measures to be voted upon in a political subdivision less than the State remained the same as it was prior to the 1929 amendment. There is nothing in the language employed in the 1931 amendment that indicates the legislature intended to change the requirement as to such public measures. Under such circumstances we perceive no reason why the construction given the section in the *Elledge case supra,* should not be applied to that part of the section which deals with public measures to be voted upon in a district or political subdivision of the State. In adopting the several amendments it is obvious the legislature intended that the term "separate ballot" meant a ballot separate and distinct from the ballot upon which the names of

candidates for office should appear, and that it did not refer to a separate ballot for each public measure. The objection is not well taken.

In plaintiff's reply to defendant's answer it was alleged that there was no registration of voters in the defendant city prior to the election. It was stated that sections 10 and 14 of article 4, and sections 15 and 18(e) of article 13 of the Cities and Villages Act, (Ill. Rev. Stat. 1939, chap. 24, pars. 60, 64, 279 and 282,) and the provisions of the Registration Act of 1865, (Ill. Rev. Stat. 1939, chap. 46, pars. 139-153,) made a registration of electors mandatory and that failure to comply with said requirements made the election void. No fraud was charged, so that the contention of plaintiff rests upon the bare allegation that there was no registration of electors as required by statute. Defendants' motion to strike this part of the reply was sustained. The assignment on this ruling is raised under point 4 above.

The city had not adopted the City Election Act. The statute in reference to the registration of voters was changed in 1941, and therefore in this case any reference to the statute must be as to the law at the time of the election, October 15, 1940. The Registration Act of 1865 provided that the judges in any election precinct should constitute a board of registry and that they should meet three weeks prior to any State election and make a list of all persons qualified to vote at the ensuing election and that, when made, such list should be known as the register of electors. The statute contained other directions but by section 7 of the act it was provided that no person whose name did not appear on the register should be privileged to vote unless he should furnish the judges of election his affidavit in writing, stating that he was entitled to vote. This had to be corroborated by the affidavit of a householder residing in the precinct who was entitled to vote and whose name appeared on the register. There is considerable argu-

ment in the briefs as to whether the matter of registration of voters at this special election was controlled by the above Registration Act or by the provisions of the Commission Form of Government Act, and the Cities and Villages Act. It is not necessary to consider that question, for the provisions in the various acts in reference to registration are so similar that if registration was required for this election under either act the same principle would control.

The provisions requiring registration under the Registration Act of 1865 have been held to be directory and not mandatory. (*Flowers* v. *Kellar,* 322 Ill. 265; *Clark* v. *Robinson,* 88 id. 498; *Dale* v. *Irwin,* 78 id. 170.) Disregard of the provisions of the election laws by those in charge of an election can not be urged in a *quo warranto* action as vitiating the election unless the provisions violated are mandatory and not directory. (*People ex rel. Agnew* v. *Graham,* 267 Ill. 426, and cases there cited.) In this case it was said, "A mandatory provision in a statute is one the omission to follow which renders the proceeding to which it relates illegal and void, while a directory provision is one the observance of which is not necessary to the validity of the proceeding." Under the previous holdings that the statutory requirements referred to in reference to registration are directory and not mandatory, the objection, without allegations of fraud or other harm affecting the result of the election, can not be availed of in a *quo warranto* action. The motion to strike was properly sustained.

The sixth assignment, that irregularity in the conduct of the election made the election void, is founded upon the allegation in plaintiff's reply that the violation of the provisions of the Australian Ballot Act, Municipal Ownership Act and the law in reference to registration of voters, all of which have been disposed of, are sufficient to declare the election void. It is further alleged that the making of

the contract with Lansford & Company; the procuring of contracts with the electric consumers in the city, so as to assure Lansford & Company and the city there was sufficient demand for electricity that they could safely proceed with the project; the facts that the officials of the city used money belonging to the city prior to the election for propaganda purposes, that the city officials and its employees were guilty of pre-election activities in favor of the proposition, that members of the city police force were stationed in and around the voting places soliciting votes for the proposition, that no person representing the opposition was privileged to appear as watcher at the polls, that there was solicitation of votes within 100 feet of the voting place contrary to the statute, are matters the doing of which renders the election void. Defendant's motion to strike the parts of the reply containing such allegations was sustained.

Treating the matters pleaded as true, they are not sufficient to show that any one or more of them in any way affected the result of the election. The general allegation that such matters influenced the election is but a conclusion of the pleader and not sufficient to show that the result would have been different if the matters complained of had not occurred. The condition of the pleadings is best illustrated by the allegation in plaintiff's reply that "but for the foregoing irregularities, more votes would have been cast and counted against said propositions" than were cast and counted for them. Irregularities such as were pleaded may or may not affect the result of an election. It is dependent upon the effect that it has in reference to the vote cast. If it does not appear to have produced a result different from the one recorded, then it is not an irregularity that may be considered in a *quo warranto* action of this character. It is pleaded that certain provisions of the election statute have been violated but this, alone, is not sufficient to render the election void. It has

been held in many cases that where no fraud or other harm is shown or no legal voter has thereby been deprived of his vote, failure on the part of election officials to observe directory provisions of the election laws will not invalidate the election. *People* v. *Graham, supra.*

Plaintiff's next contention is that ordinance No. 6 is void because the utility certificates were made payable at a place other than the city treasury. The Municipal Ownership Act makes no provision as to where utilities certificates shall be payable. Plaintiff relies upon *Prettyman* v. *Supervisors of Tazewell County,* 19 Ill. 406, *People ex rel. Peoria and Oquawka Railroad Co.* v. *County of Tazewell,* 22 id. 147, and *City of Pekin* v. *Reynolds,* 31 id. 529, in support of his claim that such direction of payment renders the ordinance void. The *Prettyman case, supra,* was an action by a taxpayer to enjoin the payment of bonds issued under an act authorizing a county under conditions prescribed to issue bonds in aid of the construction of a railroad through the county. The act contained a provision that interest coupons could be made payable at such place or places as the issuing agency might direct but it was silent as to the place where the principal of the bonds was payable. The bonds and interest coupons were made payable in New York City. It was held that since the statute expressly mentioned the right to fix the place for payment of the interest, the inference would arise that the legislature intended to exclude the principal of the bond from such provision. In the *Peoria and Oquawka Railroad case, supra,* a *mandamus* was sought to command the issuance of certain bonds in conformity with proceedings which the municipality had taken. The proceedings directed that payment of the bonds should be in New York City. It was held that, in the absence of a statute authorizing it, a municipality had no power to designate a place of payment of its bonds other than at its own treasury. In the *City of Pekin case, supra,* Reynolds brought an action on a coupon for interest on a bond issued by the city. The coupon was

payable in New York City and plaintiff made demand at the place designated for payment but made no demand at the office of the city treasurer. Under the conditions upon which the bond was authorized and interest payable, it was held that it was necessary that there be an averment and proof of a demand upon the city treasurer. Following the *Peoria and Oquawka Railroad case, supra,* it was held that municipal corporations could not, in the absence of statutory authority, bind themselves to pay their indebtedness at any place other than at their treasury.

Defendant relies upon *Johnson* v. *County of Stark,* 24 Ill. 75, *Sherlock* v. *Village of Winnetka,* 68 id. 530, in support of its contention that the provisions as to place of payment did not render ordinance No. 6 void even though it was a clause that could not be enforced. In *Johnson* v. *County of Stark, supra,* the action was to recover on bonds and coupons issued by the defendant to a railroad company, which were made payable at the city of New York. The court distinguishes the question decided in the *Peoria case, supra,* and said: "This case presents the question, whether instruments, evidencing their indebtedness payable specifically at any other place, are void, or whether they may be upheld as payable at their treasury. * * * The doctrine is well recognized, that in exercising a power, all acts performed in excess of, or beyond the power delegated, must be rejected as unwarranted; and if, after their rejection, there has been enough done to show a proper execution of the power, the act will be sustained, irrespective of the acts beyond the power delegated. But, on the contrary, if the acts performed beyond the authority conferred, are so inseparably connected with the acts properly performed, that by their rejection, the power remains unexecuted, then the whole transaction must be rejected as void. When tested by this rule, it will be perceived that this *coupon* may be sustained as valid, and payable at the treasury of the county. The law authorized the county to issue it, and requires no place of payment to be named.

And where none is specified, it, by operation of law, is payable at the treasury. If this coupon had not contained the language, 'at the city of New York,' it would have been a legal instrument, strictly conforming to all the requirements of the law authorizing counties to issue evidences of indebtedness. If, then, this unauthorized portion of the coupon was rejected, it would be in conformity to the law, and for the purpose of upholding it, the law will reject that portion as surplusage." In *Sherlock* v. *Village of Winnetka,* the action was to enjoin the collection of taxes levied to pay interest on certain bonds of the city, the validity of which was questioned in the proceeding. One of the objections was that the bonds were payable at a bank in Chicago instead of at the treasury. The court said: "The objection that the bonds are illegally made payable at a bank in Chicago, does not invalidate them, as was held in the case of *Johnson* v. *Stark County,* 24 Ill. 75. The agreement to pay at that place is void, but the balance of the coupons and bond are not rendered invalid for that reason. In paying the interest the treasurer should not obey that agreement in the bond, but pay it at the village treasury." No other cases subsequently decided have been called to our attention and we have been unable to find any. This case could be disposed of by adopting the principle announced in the *Johnson* and *Winnetka cases, supra,* by rejecting the provision in reference to payment in Chicago as surplusage. However, this would give recognition and continue in effect the principle that a municipality, in the absence of statute, has no power to fix a place of payment for the securities it issues at a place other than its treasury. The reasons which gave support to the rule as announced in the earlier cases no longer exist. The means of transportation and communication, the methods by which municipal securities are issued and sold have so changed since those early decisions that the rule announced therein should no longer prevail. When the reason that supports a rule of this character has been changed by the condition of

the times so that the reason no longer supports the rule, the rule should be changed. Insofar as the cases referred to hold that a municipality issuing bonds, coupons or other form of securities has no power, in the absence of statute, to provide for a place of payment other than its treasury, they are not followed. A majority of the courts in other jurisdictions where this question has been decided support the rule now adopted. See 119 A. L. R. Annotations, page 211. Plaintiff's assignment on this point can not be sustained.

In support of plaintiff's final assignment of error, reference is made to the Lansford & Company contract. It is urged that the contract is void and that since it is void and was entered into prior to the adoption of ordinance No. 6, it was the underlying cause that brought about the enactment of both ordinances and the calling of the election. When the case of *Fletcher* v. *City of Paris*, 377 Ill. 89, was before this court on an action brought by taxpayers to enjoin the holding of the special election referred to in these proceedings the statement was made in the opinion that it was conceded that the Lansford contract was void. In the manner in which the question now arises, it makes little difference as to whether the Lansford contract was valid or void. The whole question arises on the allegations contained in the plaintiff's reply which were stricken on defendant's motion.

Even though the contract was void and unenforcible, this does not, in itself, establish fraud in the adoption of the ordinance and the holding of the election. It may have been vulnerable to attack in a proper action but it is of no aid to plaintiff here unless the making of it and the circumstances surrounding its execution shall be given the effect of rendering the ordinances void or the election illegal. No facts are pleaded to sustain such a holding. In this action we are concerned only with defendant's right to exercise the power it claimed in issuing the utility certificates and disposing of them in the manner proposed.

The Municipal Ownership act provided the power, and the adoption of proper ordinances and the holding of a valid election gave defendant the right to exercise that power. The disposal of the certificates by contract was a step in the execution of the power and is not a subject of inquiry in this action. (*People* v. *Taylor, supra.*) If the contract is void, interested parties may maintain an action enjoining further proceedings under it but such restriction of action would not affect the right of the defendant to exercise the power it possesses and dispose of the certificates in a proper manner.

Defendant contends that this cause should have been disposed of by dismissing the appeal, thus permitting the judgment of the lower court to remain in full force and effect. The basis of such contention is that it was a private prosecution being prosecuted by the State's Attorney for and at the behest of the Central Illinois Public Service Company, a public utility, and second, that the State's Attorney is without authority to prosecute an appeal, such authority being vested solely in the Attorney General.

Before filing an answer, defendant moved to dismiss the information and assigned as a reason in support of the motion that the suit involved purely private rights. Affidavits were filed and evidence introduced in support of it. After a hearing the motion was denied. No cross errors were assigned on the ruling and in defendant's argument on this appeal it is said that no exception is now taken to that ruling. Under such conditions of the record that point will not be given further consideration.

An information in the nature of a *quo warranto* must be carried in the name of the People. (*People ex rel. Moltz* v. *Barber,* 289 Ill. 556.) The one filed in this case was in the name of the People and the appeal was taken in the same name. This limits the question to an inquiry of the authority of a State's Attorney to file a notice of appeal for and on behalf of the People in this kind of a case.

The duties of the Attorney General and the State's Attorney are prescribed in chapter 14 of the Revised Statutes of 1941. By section 4 it is made the duty of the Attorney General "to appear for and represent the people of the state before the supreme court * * * in all cases in which the state or the people of the state are interested." In the first subparagraph of section 5, in prescribing the duties of State's Attorneys, it is provided "to commence and prosecute all actions * * * in any court of record in his county, in which the people of the state or county may be concerned." And in the eighth subparagraph, it directs he is "to assist the attorney general whenever it may be necessary, and in cases of appeal or writ of error from his county to the supreme court, to which it is the duty of the attorney general to attend, he shall, a reasonable time before the trial of such appeal or writ of error, furnish the attorney general with a brief, showing the nature of the case and the questions involved."

By section 2 of the Quo Warranto Act (Ill. Rev. Stat. 1941, chap. 112) the Attorney General and State's Attorney have equal power to institute proceedings under that act in cases in which the State or the people of the State, or the people of any county or portion thereof are interested. Section 7 of the act provides that the provisions of the Civil Practice act, including the provisions for appeal, shall apply to all proceedings under the act.

The People, in whose name the State's Attorney has the authority to institute a *quo warranto* action, have the right of appeal, and under the authority given the State's Attorney in the acts referred to it necessarily follows that he has the undoubted right to prosecute an appeal in a *quo warranto* action in the name of the People from any adverse judgment entered in such a case.

The judgment of the circuit court was correct and is affirmed.